## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | |
|---|---|
| MAX KHAZANOV, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | )     Case No. 3:26-cv-00401 |
| | )     Judge Aleta A. Trauger |
| CHRISTOPHER BULLOCK, Field Office | ) |
| Director of the New Orleans Field Office, | ) |
| U.S. Immigration and Customs | ) |
| Enforcement,[1] *et al.*, | ) |
| | ) |
| Respondents. | ) |

**MEMORANDUM**

Before the court are petitioner Max Khazanov's Amended Verified Petition for Writ of Habeas Corpus ("Amended Petition") (Doc. No. 22) and his request to convert the Amended Temporary Restraining Order ("TRO") (Doc. No. 6) to a preliminary injunction. The respondents (collectively referred to herein as the "government") have filed a joint Response in opposition to both (Doc. No. 28), and the petitioner filed a Reply (Doc. No. 30). Both parties submitted evidentiary material in support of their respective positions, and oral argument was held on Wednesday, June 3, 2026. The petitioner attended the hearing by remote video hookup from his detention facility in West Tennessee.

---

[1] Respondent states that "Christopher Bullock is the only appropriate respondent because he is now the Field Office Director of the New Orleans Field Office, U.S. Immigration and Customs Enforcement." (Doc. No. 28 at 1 n.1.) In light of that representation, the Clerk is **DIRECTED** to modify the case caption to substitute Christopher Bullock for both Ladwig and Acuna, pursuant to Rule 25(d).

For the reasons set forth herein, the Amended Petition will be granted in part, the government will be directed to release the petitioner immediately under the terms of the original Order of Supervision, and the Amended TRO will be dissolved as moot.

## I. PROCEDURAL HISTORY

Khazanov filed his original Petition and Emergency Motion for Temporary Restraining Order ("TRO Motion") on April 3, 2026. The court entered an *ex parte* TRO, swiftly followed and superseded by the Amended TRO entered on April 6, 2026, ordering that Khazanov not be removed from the United States or moved outside the territory of the Middle District of Tennessee pending further order of the court. (Doc. No. 6 at 1.) In the event the petitioner was moved outside the Middle District of Tennessee prior to entry of the Amended TRO, the court ordered that he not be moved outside of Tennessee. (*Id.* at 2.) The court set a preliminary injunction hearing for two weeks later, on April 20, 2026. (*Id.*) The court subsequently granted both the government's unopposed motion to continue that hearing and the parties' subsequent joint Motion to Set Preliminary Injunction Hearing and Hearing on Amended Petition for Writ of Habeas Corpus; the hearing on both was reset for June 3, 2026. (*See* Doc. Nos. 20, 21, 25, 26.)

Despite entry of the Amended TRO and petitioner's counsel's notification to the U.S. Attorney's Office of same, Khazanov was moved from Nashville to the Western Tennessee Detention Facility at some point, and from there to the Jena/LaSalle Detention Facility in Louisiana at 8:19 p.m. on April 7, 2026. He was returned to the Western Tennessee Detention Facility on April 10, 2026, where he remains in custody. (*See* Doc. No. 18 at 4.)

## II. THE AMENDED PETITION

### A. Background

Petitioner Max Khazanov is a native and citizen of Russia. He was admitted to the United States in July 1991, at age fifteen, as the child of an "exchange visitor"; he became a Lawful

Permanent Resident in 1993. (Am. Pet. ¶¶ 17–18.) In 1994, when he was eighteen, Khazanov was convicted of state law crimes committed when he was seventeen. (*Id.* ¶ 19.) He was placed in deportation proceedings in 1995 and found deportable based on these convictions. (*Id.* ¶ 20.) However, he was granted a deferral of deportation pursuant to the Convention Against Torture ("CAT"), based upon an Immigration Judge's determination that Khazanov "would more likely than not be tortured by a public official, or at the instigation or with the acquiescence of such an official, if removed to Russia," because of the circumstances of his father's defection to the United States. (Doc. No. 28-1, Decision and Order of Immigration Judge at 10–11; *see also id.* at 13 (denying the petitioner's applications for asylum, withholding of deportation, and withholding under the CAT, but granting deferral of removal under the CAT, pursuant to 8 C.F.R. § 1208.17).)

That decision was affirmed by the Board of Immigration Appeals ("BIA") on December 21, 2004. (Doc. No. 22-2.) That Order "informed the [petitioner] that deferral of removal does not confer upon him any lawful or permanent immigration status, will not necessarily result in release from custody, is effective only until terminated, and is subject to review and termination if it is not more likely than not that he will be tortured in Russia or if he requests termination. Furthermore, the [petitioner] may be removed at any time to a country where he is not likely to be tortured." (*Id.*) As the government in the present case acknowledges, the BIA's Order became administratively final at that time, on December 21, 2004. (Doc. No. 29, Gray Decl. ¶ 21.) At some point in 2010, the U.S. Immigration and Customs Enforcement ("ICE") placed Khazanov on an Order of Supervision ("OSUP"). (*Id.* ¶ 13; *see also* Am. Petition ¶ 24.)[2]

---

[2] The government's suggestion at oral argument that Khazanov was not placed on an OSUP prior to 2010 because the government did not know where he was is not supported by the record and, in any event, is irrelevant. Nothing in the record suggests that Khazanov has engaged in unlawful conduct at any time since entry of the final removal Order.

In the interim, Khazanov graduated from college in 1998. He graduated from Vanderbilt University Owen School of Business in 2005 with a Master of Business Administration. (Am. Petition ¶¶ 22, 25.) He has resided in Nashville since 2006 and is married to a U.S. citizen, with whom he has three children. (*Id.* ¶ 26.) He attests that he has resided in the same home for approximately fifteen years and in the same neighborhood for approximately twenty years. (*Id.* ¶ 27.) Khazanov and his wife own several businesses that directly employ more than one hundred individuals and that have collectively paid more than $1 million in taxes in each of the last ten years. (*Id.* ¶ 29.) Beginning in April 2010, Khazanov regularly reported to ICE in Nashville as required by his OSUP. (*Id.* ¶ 30.)

According to the government, Khazanov missed "check ins" required by his OSUP in 2013 and 2014 and "stopped reporting altogether after his August 24, 2023, check-in." (Gray Decl. ¶ 14.) In June 2024, the petitioner's wife, Jennifer Khazanov filed a Form I-130 Petition for Alien Relative with U.S. Citizenship and Immigration Services ("USCIS") to sponsor Khazanov for citizenship as the spouse of a U.S. citizen. However, the petition was denied on January 6, 2026 due to Khazanov's failure to appear at a "biometrics appointment" related to that petition. (Am. Petition ¶ 32.)

**B.      Detention by ICE**

On the morning of April 3, 2026, Khazanov was detained at his home in Nashville, without notice, and taken into custody by ICE. (*Id.* ¶ 2.) Once in custody, he was served a first Notice of Revocation of Release ("First Notice"), on which boxes were checked to indicate that his "release has been revoked pursuant to 8 C.F.R. § 241.13(i)," because he "violated a condition of [his] release," specifically by "[f]ailure to check in on multiple occasions." (Doc. No. 22-11 at 1.) Although the document was not signed by the Field Office Director, a typed "proof of service"

indicates that it was served on Khazanov at 13:15 on 04/03/2026 at "ICE/ERO [Enforcement and Removal Operations] Nashville" and that the detainee "refused to sign." (*Id.* at 2.)

The First Notice contains a "Notice of Informal Interview" section that states: "On _____, you will be afforded an informal interview at which you will be given an opportunity to respond to the reasons for this revocation. You may submit any evidence of information you wish to be reviewed in support of your release." (*Id.*) Under the underlined blank, there is a reference to "Date (MM/DD/YYYY)." This blank space in the First Notice was not filled in, and Khazanov denies that he was afforded an informal interview on April 3, 2026 or at any time after that date. (Am. Petition ¶ 47.) The government contends that he was "provided with an informal interview" on that date and that the "interview portion was inadvertently left blank on the notice." (Gray Decl. ¶ 16.)[3]

The government contends that a second "final, signed" version of the Notice of Revocation of Release ("Second Notice") was served on the petitioner on April 3, 2026, "[o]nce the revocation of release was reviewed by a supervisor and provided to Acting Field Office Director Acuna," who confirmed that the "decision to revoke" was "based on ERO's ability and means to effectuate petitioner's removal." (Gray Decl. ¶ 16.) Indeed, the Second Notice was digitally signed by then Acting Field Office Director Brian Acuna at 14:36 on April 3, 2026. (*See* Doc. No. 22-12 at 2.) This Second Notice gives an entirely different reason for the revocation of release than the First Notice, which identified failure to check in as the reason for revocation. The Second Notice states, instead, that Khazanov's release was revoked pursuant to 8 C.F.R. § 241.4(*l*), on the basis that "[i]t is appropriate to enforce the removal order entered against you as ICE has the ability and means

---

[3] Assistant Field Office Director Paul Gray, who "manage[s] ERO personnel and provide[s] oversight over the Western Tennessee Detention Facility," makes that assertion based on his review of the "ICE computer databases for Petitioner." (Gray Decl. ¶¶ 2, 4.)

to effectuate your removal." (*Id.* at 1.) The form provides space for ICE to indicate whether it has obtained or is seeking a travel document to effect removal to a specific country, but these spaces are blank. In support of the enforcement of the removal order, the form states only: "On 06/20/2003, you were ordered removed to __Russia__ , but you were granted withholding of removal[4] to __Russia__ . Your case is under review for removal to an alternate country." (*Id.*) No specific alternate country is identified. In fact, counsel for the government conceded at oral argument that the government has not yet identified a country that will accept the petitioner, despite the petitioner's having been in custody now for more than sixty days—and despite the fact that the deferral of removal has been in effect for more than twenty years.

Although this form, like the First Notice, indicates that the petitioner was served the document at 1:15 p.m. on April 3, 2026 but refused to sign it, Khazanov denies being served the Second Notice until it was provided by counsel for the government to his counsel sometime after he filed his original Petition. (Am. Petition ¶ 48.) The fact that it was not digitally signed by Acuna until after it was supposedly served on Khazanov tends to support the petitioner's assertion that it was not served on him at all until it was provided later to his counsel.

On this form, too, the date of the informal interview to be "afforded" to the petitioner "at which [he] will be given an opportunity to respond to the reasons for this revocation" is left blank. (Doc. No. 22-12 at 2.) As stated above, the petitioner denies in his verified Amended Petition that he has ever received an informal interview. The suggestion that he was never provided the Second Notice until it was provided to his lawyer after he filed his petition for habeas relief supports the conclusion that he was not afforded an informal interview after receiving the Second Notice.

---

[4] Confusingly, in fact, Khazanov was denied "withholding of deportation" but was granted "deferral of removal." (*See* Doc. No. 28-1 at 13.)

The petitioner also objects to the indication, in the Second Notice, that the government intends to deport him to an unidentified third country, without notice or an opportunity to object under the CAT. He contends, as discussed below, that the government's newly adopted Third Country Removal Policy is unconstitutional.

### C.    Claims in Habeas Petition

Khazanov asserts that: (1) his detention and the revocation of his OSUP on April 3, 2026 were arbitrary and capricious, lacking a "reasoned explanation" and based only on "shifting justifications," in violation of the Immigration and Nationality Act ("INA") and the Administrative Procedure Act ("APA") (Am. Petition ¶¶ 65–69) (First Claim for Relief); (2) his detention and the revocation of his OSUP without a hearing to determine if he poses a flight risk or danger to the community is a violation of his Fifth Amendment right to due process (*id.* ¶ 71) (Second Claim for Relief); (3) his deportation to an undesignated third country without an opportunity to apply for protection under the CAT with respect to that country violates the INA and the Foreign Affairs Reform and Restructuring Act ("FARRA"), which implements the CAT (*id.* ¶ 73) (Third Claim for Relief); (4) his deportation to an undesignated third country without an opportunity to apply for protection under the CAT with respect to that country violates his Fifth Amendment right to due process (*id.* ¶¶ 75, 78) (Fourth and Fifth Claims for Relief); (5) the Third Country Removal Policy adopted by the government in July 2025 is arbitrary and capricious and not in accordance with law, in violation of the APA, particularly insofar as "[r]emoval to a third country that itself has no apparent reason to allow someone like Mr. Khazanov to reside in that third country indefinitely creates an unacceptably high risk of 'chain refoulement' back to the very country against which protection has been granted, in this case Russia" (*id.* ¶ 81) (Sixth Claim for Relief); (6) the revocation of Khazanov's OSUP without affording him an informal review, as required by the governing regulations, and his detention without compliance with those regulations (either 8

C.F.R. § 241.4(*l*)(1) or 8 C.F.R. § 241.13(i)(3)), constitutes a violation of due process (*id.* ¶¶ 84–86) (Seventh Claim for Relief); (7) revocation of an OSUP under 8 C.F.R. § 241.13 is appropriate only "if, on account of changed circumstances, the Service determines that there is a significant likelihood that the alien may be removed in the reasonably foreseeable future," 8 C.F.R. § 241.13(i)(2), which has not occurred in this case, making his continued detention without compliance with 8 C.F.R. § 241.13(i)(2) unlawful (*id.* ¶¶ 88–93) (Eighth Claim for Relief); and (8) Khazanov's continued indefinite detention is unlawful under *Zadvydas v. Davis*, 533 U.S. 678 (2001) (*id.* ¶¶ 95–98) (Ninth Claim for Relief).

The petitioner seeks to be immediately released under the terms and conditions of his prior OSUP and declarations that his continued detention violates his right not to be deprived of liberty without due process, under the Fifth Amendment; that the purported revocation of his OSUP is arbitrary and capricious and in violation of the APA, the INS, and governing regulations; and that the respondent's Third Country Removal Policy is unconstitutional. He also seeks court orders barring re-detention without a hearing and requisite findings, barring his removal to any third country without notice and a meaningful opportunity to respond, and barring his removal from the Middle District of Tennessee without leave of court. (Am. Petition at 22–23.)

### D. The TRO Motion

Khazanov's TRO Motion similarly asserts that the government has taken him into custody "under circumstances suggesting that they either intend to detain him for purely punitive purposes, or intend to remove him to some as-yet-unknown third country in which he might be tortured or from which there may be a significant likelihood that he could in turn be returned to Russia [by that third country] and tortured in Russia." (Doc. No. 4 at 2.) He argues that, once removal occurs, this court would likely be divested of jurisdiction and that he has meritorious claims that he is entitled to notice and an opportunity to respond before removal to any third country, as several

courts have recognized. He asks that the court order that he not be moved outside Tennessee or, at a minimum, that he not be moved out of the United States pending resolution of the merits of his claims.

### E. The Government's Response

The government responds to both the Amended Petition and the TRO Motion, asserting that the former should be dismissed, the latter denied, and the Amended TRO dissolved. In support of its position, the government maintains that Khazanov has been subject to a final order of removal since December 21, 2004 and is now detained pursuant to 8 U.S.C. § 1231. (*See* Gray Decl. ¶ 12 ("Petitioner is currently detained pursuant to INA § 241.").) The government asserts that the petitioner, having previously been granted a deferral of removal to Russia under the CAT, "will be removed to a third country pursuant to Department of Homeland Security ('DHS') policy." (Doc. No. 28 at 2.) Because, the government argues, the district courts lack jurisdiction over suits challenging actions taken to execute final orders of removal, the petitioner is not entitled to relief.

Lest it appear that the petitioner's fear of removal, without notice or an opportunity to be heard, to a third country with which he has no relationship is paranoid or overblown, the government specifically acknowledges that Khazanov is being detained pursuant to 8 U.S.C. § 1231 "awaiting removal to a third country pursuant to DHS policy"—in other words, pursuant to the Third Country Removal Policy, to which the government refers as the March 30, 2025 Guidance Regarding Third Country Removals ("March 2025 Guidance"). (Doc. No. 28 at 4 (citing March 2025 Guidance, Doc. No. 28-2).) The March 2025 Guidance purports to "clarif[y] DHS policy regarding the removal of aliens with final orders of removal" under 8 U.S.C. §§ 1229a, 1231(a)(5), and 1228(b) (INS §§ 240, 241(a)(5), and 238(b)) "to countries other than those

designed for removal in those removal orders." (Doc. No. 28-2 at 1.) As the government

summarizes it,

> [The] policy distinguishes between removals to countries that have provided credible assurances that any aliens removed there will not be persecuted or tortured, and removals to those countries that have not done so.
>
> For countries that have provided such an assurance, "the alien may be removed without the need for further procedures." For countries that have not, DHS must first inform the alien of removal to the country and give him an opportunity to "affirmatively express a fear of persecution or torture" there. If he does so, an immigration officer will refer the alien to U.S. Citizenship and Immigration Services ("USCIS"). USCIS will conduct a prompt screening to determine whether he "would more likely than not be" . . . persecuted or tortured in the country of removal. If the alien fails to satisfy this standard, he "will be removed." If he does satisfy it, he will be put into additional administrative procedures before the Immigration Court. "Alternatively, ICE may choose to designate another country for removal," and start the process afresh.

(Doc. No. 28 at 5 (quoting Doc. No. 28-2 at 1–2).)

More specifically, the government argues that (1) the district courts lack jurisdiction over

"any cause or claim by or on behalf of any alien arising from the decision or action . . . to

commence proceedings, adjudicate cases, or execute removal orders," 8 U.S.C § 1252(g); (2) the

petitioner's challenge to his detention under 8 U.S.C. § 1231 is premature and subject to dismissal

under the doctrine announced in *Zadvydas v. Davis*; (3) Khazanov's claims are without merit,

because ICE is authorized to detain and deport him without a bond hearing or release, under 8

U.S.C. § 1231(a)(6); (4) ICE is complying with Post Order Custody Review ("POCR") regulations,

providing all the process to which Khazanov is due (Doc. No. 28 at 10 (citing 8 C.F.R. § 241.4));

and, in any event, (5) "Petitioner fails to carry his burden of demonstrating that there is no

significant likelihood of removal in the reasonably foreseeable future" (*id.* at 12 (citing *Zadvydas

v. Davis*, 533 U.S. 678, 678, 701 (2001); *Akinwale v. Ashcroft*, 287 F.3d 1050, 1052 (11th Cir.

2002))).

**F.     The Petitioner's Reply**

The petitioner filed a Reply, which asserts that 8 U.S.C. § 1252(g) does not bar his claims and that the court "clearly has jurisdiction" over claims that his detention is "unlawful because it violates the statute, governing regulations, and his Constitutional rights." (Doc. No. 30 at 7.) He asks that the court, at a minimum, convert the Amended TRO into a preliminary injunction, to protect its jurisdiction, and, alternatively, that it grant his petition on the merits. In support of the latter request (which is the primary focus of his Reply), he argues that the government's reliance on *Zadvydas* to justify his detention is misplaced and that the burden is on the *government* to show a significant likelihood of removal in the reasonably foreseeable future. He argues that the government has failed to comply with its own regulations—regulations designed to protect fundamental constitutional rights. In addition to asking the court to immediately release him from custody, Khazanov also asks the court to order the government not to re-detain him in reliance upon the unlawful Third Country Removal Policy or without providing him the process he is due under the INA, its implementing regulations, the FARRA, and the Constitution.

The petitioner has the better argument here, as many courts have found under similar circumstances.

## III.     DISCUSSION

The court comes to this case against a backdrop of recent cases detailing government overreach and the unlawful detention and deportation of noncitizens. Because dozens of district courts have rejected the very arguments the government raises here, this court does not write on an otherwise blank slate.

**A.     The Court Has Jurisdiction**

A district court may grant a writ of habeas corpus if a petitioner is in federal custody in violation of the Constitution or federal law. 28 U.S.C. § 2241. "At its historical core, the writ of

habeas corpus has served as a means of reviewing the legality of Executive detention, and it is in that context that its protections have been strongest." *I.N.S. v. St. Cyr*, 533 U.S. 289, 301 (2001), *superseded in other part by statute as recognized in Nasrallah v. Barr*, 590 U.S. 573 (2020). Section 2241(c)(3) authorizes "any person to claim in federal court that he or she is being held 'in custody in violation of the Constitution or laws . . . of the United States.'" *Zadvydas*, 533 U.S. at 687 (quoting 28 U.S.C. § 2241(c)(3)). Accordingly, § 2241 confers jurisdiction upon the federal courts to hear challenges to the lawfulness of immigration-related detention. *Id.* (citing 28 U.S.C. § 2241(c)(3)); *see also A. A. R. P. v. Trump*, 605 U.S. 91, 94–95 (2025); *Rosales-Garcia v. Holland*, 322 F.3d 386, 394 (6th Cir. 2003). While the court "may not review discretionary decisions made by immigration authorities, it may review immigration-related detentions to determine if they comport with the demands of the Constitution." *Deng Chol A. v. Barr*, 455 F. Supp. 3d 896, 901 (D. Minn. 2020) (citing *Zadvydas*, 533 U.S. at 688).

The government contends that the court lacks jurisdiction in this case, because, as the government repeatedly emphasized at oral argument, a final order of removal has been in effect since 2004, and "Congress has unambiguously stripped district courts of jurisdiction over 'any cause or claim by or on behalf of any alien arising from the decision or action . . . to commence proceedings, adjudicate cases, or execute removal orders.'" (Doc. No. 28 at 6 (quoting 8 U.S.C § 1252(g)).)

Section 1252(g) provides:

Except as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

8 U.S.C. § 1252(g)

The United States Supreme Court has held that the scope of § 1252(g) is "narrow" and only "limits review of cases 'arising from' decisions 'to commence proceedings, adjudicate cases, or execute removal orders.'" *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 19 (2020) (quoting 8 U.S.C. § 1252(g)). The Court has also "rejected as 'implausible' the Government's suggestion that § 1252(g) covers 'all claims arising from deportation proceedings' or imposes 'a general jurisdictional limitation.'" *Id.* (quoting *Reno v. Am.-Arab Anti–Discrimination Comm.*, 525 U.S. 471, 482 (1999)). Accordingly, federal courts retain "jurisdiction to review [a noncitizen's] detention insofar as that detention presents constitutional issues." *Nguyen v. Noem*, No. 5:25-CV-176, 2026 WL 237282, at *5 (S.D. Tex. Jan. 28, 2026) (quoting *Oyelude v. Chertoff*, 125 F. App'x 543, 546 (5th Cir. 2005); and citing *Nielsen v. Preap*, 586 U.S. 392, 401–02 (2019); *Maldonado v. Macias*, 150 F. Supp. 3d 788, 794 (W.D. Tex. 2015) ("[E]ven after the passage of the REAL ID Act, district courts retain the power to hear statutory and constitutional challenges to civil immigration detention under § 2241 when those claims do not challenge a final order of removal, but instead challenge the detention itself.")). Courts have also specifically recognized that "Section 1252(g) does not bar courts from reviewing an alien detention order, because such an order, 'while intimately related to efforts to deport, is not itself a decision to 'execute removal orders' and thus does not implicate section 1252(g).'" *Id.* (quoting *Cardoso v. Reno*, 216 F.3d 512, 516–17 (5th Cir. 2000)).

In short, the court is not persuaded by the government's conclusory and unsupported assertion that § 1252(g) deprives this court of jurisdiction to consider Khazanov's petition under § 2241. The court has jurisdiction to consider the petitioner's statutory, regulatory, and constitutional claims.

**B.      The Petition Is Not Premature Under *Zadvydas***

The government's primary argument is that it is authorized under 8 U.S.C. § 1231(a)(1) to detain the petitioner and that, under the Supreme Court's decision in *Zadvydas*, the Amended Petition is premature and must be dismissed.

Generally, under § 1231, once an Immigration Judge issues a removal order and that order becomes "final," the Attorney General has ninety days to affect the detainee's departure from the United States. *See* 8 U.S.C. § 1231(a)(1)(A). The ninety-day "detention period" (or "removal period") is calculated to begin on the latest of

> (i) The date the order of removal becomes administratively final.

> (ii) If the removal order is judicially reviewed and if a court orders a stay of the removal of the alien, the date of the court's final order.

> (iii) If the alien is detained or confined (except under an immigration process), the date the alien is released from detention or confinement.

*Id.* § 1231(a)(1)(B). In general, during the ninety-day detention period, the detainee must remain detained. *Id.* § 1231(a)(2). The period is tolled and extended only if "the alien fails or refuses to make timely application in good faith for travel or other documents necessary to the alien's departure or conspires or acts to prevent the alien's removal subject to an order of removal." *Id.* § 1231(a)(1)(C). If the detainee is not removed within that ninety-day period, he may become eligible for supervised release until removal can be accomplished, or the government may continue to detain him for "a period reasonably necessary to bring about that alien's removal from the United States." *Zadvydas*, 533 U.S. at 689; s*ee also Clark v. Suarez Martinez*, 543 U.S. 371, 385 (2005); 8 U.S.C. § 1231(a)(3). The Court held in *Zadvydas* that an additional three months of detention (or a total of six months from the date a removal order becomes final) is presumptively reasonable. *Zadvydas*, 533 U.S. at 701.

In *Zadvydas*, however, the Supreme Court recognized that "permitting indefinite detention of an alien would raise a serious constitutional problem" and that "[f]reedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas*, 533 U.S. at 690. Thus, in *Zadvydas*, the Supreme Court held that the INA does not authorize "indefinite, perhaps permanent, detention" of noncitizens subject to final orders of removal. *Id.* at 699. Therefore, "once removal is no longer reasonably foreseeable, continued detention is no longer authorized by statute." *Id.* (citations omitted).

In other words, when detention under § 1231(a) is appropriate, there is a presumptively reasonable period of six months of detention from the time that a removal order becomes final. *Id.* at 701. After six months in custody, if a noncitizen provides "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing." *Id.* If the government does not offer sufficient rebuttal evidence once a habeas petitioner has made such a showing, then the court should grant the writ and order the habeas petitioner released under the *Zadvydas* framework. *See id.*

As numerous courts have held in similar cases, however, Section 1231(a) and *Zadvydas* simply do not apply to the facts presented here. Khazanov's removal order became final on December 21, 2004, as the government expressly recognizes. (Gray Decl. ¶ 21.) The ninety-day statutory detention period and the presumptively reasonable six-month detention period expired no later than June 21, 2005—more than twenty years ago. Numerous district courts have held that the detention period is not reset when a non-citizen is *re-detained* long after the expiration of the original detention period under § 1231. As one court explained in similar circumstances:

> Mr. Nguyen's removal order became final on September 20, 2001. The 90-day removal period authorized by statute would have expired on December 19, 2001. Respondents offer no indication that circumstances have changed which justify a reset of the presumption for reasonable detention. Besides, there is nothing in the relevant statutory language to suggest that the removal period restarts or resets automatically with another arrest or subsequent redetention, and neither *Zadvydas* nor other Fifth Circuit cases direct the Court to treat the six-month presumption of reasonableness in this manner. To adopt such reading would allow for what is, in essence, indefinite detention in successive intervals.

*Nguyen*, 2026 WL 237282, at *7 (internal record citation omitted)); *see also, e.g.*, *Garcia-Aleman v. Thompson*, No. SA-25-CV-886-OLG (HJB), 2025 WL 3534806, at *3 (W.D. Tex. Nov. 24, 2025) ("Respondents are correct that an alien is not entitled to habeas relief under *Zadvydas* before the removal period has expired. However, that argument is inapplicable here. As other courts have explained, a re-detention after release on an OSUP is not your typical first round detainment of an alien awaiting removal." (alterations, quotation marks, and citations omitted)), *report and recommendation adopted*, No. SA-25-CV-00886-OLG, 2025 WL 3532179 (W.D. Tex. Dec. 9, 2025); *Sanchez v. Noem*, No. 5:25-CV-00104, 2025 WL 3760317, at *8 (S.D. Tex. Nov. 14, 2025) ("While the Supreme Court in *Zadvydas* set six months as a reasonable time period of detention in which the Government can be presumed to be working to effectuate removal in good faith, that presumption does not reset at the time a noncitizen is re-detained after being released on an order of supervision during which time the Government could have been taking steps to effectuate the noncitizen's removal."); *Tadros v. Noem*, No. 25cv4108 (EP), 2025 WL 1678501, at *3 (D.N.J. June 13, 2025) ("To the contrary, Tadros argues his final order of removal triggered the six-month detention period under *Zadvydas*, and thus lapsed long ago. . . . Tadros has the better argument under *Zadvydas*. The 90-day removal period under 8 U.S.C. § 1231(a)(1)(B) was triggered under the circumstances present here by the BIA's affirmance of the immigration judge's order of removal and deferral of removal under CAT on April 7, 2009."); *Zavvar v. Scott*, No. 25-2104-TDC, 2025 WL 2592543 (D. Md. Sept. 8, 2025) ("*Zadvydas* contemplated only the situation in

which a noncitizen was continuously detained from the issuance of the removal order while efforts to execute the removal were ongoing . . . and did not directly address the situation presented here, where a noncitizen was not detained upon the issuance of the removal order, remained on release for over 17 years, and only then was subjected to post-removal order detention for the first time.").

While the government asserts in this case that the removal period under § 1231(a)(1)(C) "may be suspended" if the noncitizen "conspires or acts to prevent [his] removal subject to an order of removal" (Doc. No. 28 at 7), it has not presented any facts suggesting that suspension applies in this case. And the cases it cites concern efforts by noncitizens to stay removal immediately after their orders of removal were issued. *See, e.g.*, *Akinwale*, 287 F.3d at 1052 n.4 (dismissing § 2241 petition because the noncitizen had filed a motion to stay less than one month after the BIA issued its final removal order and therefore did not "have even an unencumbered month of detention . . . let alone the requisite six months" prior to the filing of his habeas petition); *Ifenatuora v. Holder*, No. 4:09-CV-153-CDL, 2010 WL 2688878, at *3 (M.D. Ga. Apr. 27, 2010) (dismissing § 2241 petition filed less than six months after the noncitizen was taken into custody following a removal order and noting that, when he "appealed the BIA's decision to the Eleventh Circuit Court of Appeals, and his request for a stay or removal was granted by the appellate court, ICE halted all removal efforts"), *report and recommendation adopted*, 2010 WL 2688236 (M.D. Ga. June 30, 2010).[5]

In this case, the final order of removal was entered in December 2004. Khazanov did not appeal the BIA's decision, and, because the removal was deferred under the CAT, he has remained at liberty for the past twenty-two years, under an OSUP for most of that time. The government has

---

[5] The other cases cited by the government are similarly off-point, insofar as they concern challenges to removal orders or § 2241 challenges to detention following the initial detention immediately following issuance of a final order of removal.

presented no legitimate reason to reset the period for presumptively reasonable detention, and Khazanov's statutory and constitutional claims are ripe for adjudication.

###### C.      The Government Has the Burden of Proof – And Fails to Carry It

The government next argues that Khazanov is eligible for re-detention by ICE to effectuate his removal under § 1231(a)(6) and that he is not entitled to a bond hearing or release, because § 1231(a)(6) "does not require such process." (Doc. No. 28 at 9 (citing *Johnson v. Arteaga-Martinez*, 596 U.S. 573, 574, 581 (2022), as holding that § 1231(a)(6)'s plain text "says nothing about bond hearings before immigration judges or burdens of proof")).) It then continues to argue that, under *Zadvydas*, the petitioner must establish that he has been detained for longer than six months and that, "after this first six months, the burden is on the petitioner to show 'good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future' before the burden shifts back to the government to rebut that showing." (*Id.* at 10 (citing *Zadvydas*, 533 U.S. at 701).) But, as set forth above, *Zadvydas*'s holding regarding the presumptive reasonableness of six months of detention under § 1231(a) simply does not apply to a re-detention following deferral. And the burden of proof, under the regulations cited by the government, shifts to the *government* to show a significant likelihood that the petitioner *will* be removed in the reasonably foreseeable future. *Accord, e.g.*, *Escalante v. Noem*, No. 9:25-CV-00182-MJT, 2025 WL 2206113, at *3 (E.D. Tex. Aug. 2, 2025).

As the petitioner points out, the government's First Notice stated that release was revoked pursuant to 8 C.F.R. § 241.13(i), but the Second Notice, which superseded the First Notice, expressly stated that the government was proceeding under 8 C.F.R. § 241.4(*l*). (Doc. No. 22-12 at 1.) Section 241.13(i)(2), entitled "Revocation for removal" provides that "the Service may revoke an alien's [supervised] release under this section and return the alien to custody if, on account of changed circumstances, *the Service determines* that there is a significant likelihood that

the alien may be removed in the reasonably foreseeable future." 8 C.F.R. § 241.13(i)(2) (emphasis added). Under § 241.4,

> The custody review procedures in this section do not apply after the Service has made a determination, pursuant to the procedures provided in 8 C.F.R. § 241.13, that there is no significant likelihood that an alien under a final order of removal can be removed in the reasonably foreseeable future. However, if *the Service subsequently determines*, because of a change of circumstances, that there is a significant likelihood that the alien may be removed in the reasonably foreseeable future to the country to which the alien was ordered removed or to a third country, the alien shall again be subject to the custody review procedures under this section.

8 C.F.R. § 241.4(b)(4) (emphasis added). In other words, the procedures under § 241.4(*l*) do not apply once the government has determined, with regard to an alien subject to a final order of removal, that there is no significant likelihood of removal to the country to which he was ordered removed or to a third country—as happened more than twenty years ago in this case when Khazanov's removal was deferred and he was placed under an OSUP—*unless* "the Service subsequently determines, because of a change of circumstances, that there is a significant likelihood that the alien may be removed in the reasonably foreseeable future to the country to which the alien was ordered removed or to a third country." *Id.*

As many courts have determined, these regulations must be construed to provide that, upon revocation of supervised release, the *government* has the burden to "show a significant likelihood that the alien may be removed." *Escalante*, 2025 WL 2206113, at *3; *see also Rodriguez Romero v. Ladwig*, --- F.Supp.3d ----, No. 25-1106-JWD-EWD, 2026 WL 321437, at *5 (M.D. La. Feb. 6, 2026) ("That is, in order to re-detain a formerly released noncitizen, it is ICE's burden to show that the noncitizen's removal from the country is *significantly likely to occur in the reasonably foreseeable future*." (emphasis added)); *Garcia-Aleman*, 2025 WL 3534806, at *4 (citing *Escalante* and collecting cases holding that the "regulations . . . place the burden on ICE to first

establish changed circumstances that make removal significantly likely in the reasonably foreseeable future").

Moreover, "the changed circumstances that make an alien's removal likely in the foreseeable future must have existed at or before the OSUP revocation; post-hoc justifications are inadequate." *Munagi v. McDonald*, 813 F. Supp. 3d 225, 228–29 (D. Mass. 2025); *see also Rodriguez Romero*, 2026 WL 321437, at *5 (same, quoting *Munagi*, 813 F. Supp. 3d at 228); *Sarail A. v. Bondi*, 803 F. Supp. 3d 775, 787–88 (D. Minn. 2025) (finding revocation unlawful where ICE was not informed that Jamaica would issue travel documents for the petitioner until after his OSUP had been revoked); *M.S.L. v. Bostock*, No. 25-1204, 2025 WL 2430267, at *13 (D. Or. Aug. 21, 2025) ("Post-hoc rationalizations cannot justify an agency's actions." (citations omitted)).

In short, the *government* has the burden of showing a "significant likelihood that [Khazanov] may be removed in the reasonably foreseeable future to . . . a third country." 8 C.F.R. § 241.4(b)(4); *Escalante*, 2025 WL 2206113, at *3. Its assertion that the petitioner has that burden is simply incorrect under the government's own regulations. And the government has made no effort to carry that burden. The Second Notice indicates only that "ICE has the ability and means to effectuate your removal." (Doc. No. 22-2 at 1.)[6] Below that line on the form, the available boxes

---

[6] Notably, the government's notice of changed circumstances must actually give the noncitizen an opportunity to respond to or otherwise contest the reasons for the revocation. *Zhang v. Genalo*, 814 F. Supp. 3d 307, 324 (E.D.N.Y. 2025) (citing 8 C.F.R. § 241.4(*l*)(1)). Thus, for example, in *Torres-Jurado v. Biden*, No. 19-CV-3595 (AT), 2023 WL 7130898, at *4 (S.D.N.Y. Oct. 29, 2023), the court found that a notice of revocation of release was deficient because it failed to make proper findings that "it was 'appropriate to enforce a removal order' against a noncitizen" and "instead stat[ed] only that 'a travel document appears forthcoming.'" Similarly, in *Perez-Escobar v. Moniz*, 792 F. Supp. 3d 224, 226 (D. Mass. 2025), the court found deficient a notice of revocation where ICE "merely asserted that 'there is a significant likelihood of removal in the reasonably foreseeable future,' that 'the purpose of [Petitioner's] release has been served,' and that 'it is appropriate to enforce the removal order,'" but without "identify[ing] any specific changed

are not checked next to the lines stating "ICE has obtained a travel document and schedule your removal to take place no later than _____," and "ICE is seeking a travel document to effect your expeditious removal to _____." (*See* Doc. No. 22-12 at 1.) Instead, only the box next to this statement was checked: "On 06/02/2003, you were ordered removed to _Russia_ but you were granted withholding of removal to _Russia_. Your case is under review for removal to an alternate country." (*Id.*) In other words, at the time he was detained, the government had not identified the country to which it intended to remove Khazanov, much less sought or obtained travel documents from that country. To date, in fact, the government has not located a country willing to accept him. And even if it had, "[p]ost-hoc rationalizations cannot justify an agency's actions." "*M.S.L.*, 2025 WL 2430267, at *13.

Further, even if it were Khazanov's burden to show no significant likelihood of removal in the reasonably foreseeable future, he has carried it, and the government has failed to rebut his showing. As Khazanov argues, the grant of deferral of removal to Russia more than twenty years ago and the failure of the government to actually identify a third country willing to accept him in the intervening period is strong proof that there is not a significant likelihood that the government will identify such a country in the near future—or procure all the necessary documentation and diplomatic assurances in the reasonably near future. Like a grant of withholding of removal, the grant of deferral of removal is evidence that the petitioner's removal in the reasonably foreseeable future is unlikely, because it "substantially increases the difficulty of removing him." *Munoz-Saucedo v. Pittman*, 789 F. Supp. 3d 387, 398 (D.N.J. 2025).

---

circumstances to support these assertions." Here, too, the Second Notice was inadequate, as it stated only that "ICE has the ability and means to effectuate your removal." (Doc. No. 22-12 at 2.)

The government makes no response to that argument. Rather, the government expressly concedes that it cannot remove Khazanov to Russia. It also concedes, as previously noted, that no third country willing to take Khazanov has been identified and that the process is generally a lengthy one. The government has not satisfied its burden of showing that it has determined, "because of a change of circumstances, that there is a significant likelihood that the alien may be removed in the reasonably foreseeable future to the country to which the alien was ordered removed or to a third country." 8 C.F.R. § 241.4(b)(4).

### D. Failure to Provide an Initial Informal Interview

In addition to requiring a significant likelihood of removal in order to revoke an OSUP, ICE's regulations provide that a noncitizen being re-detained must be informed of the reason for revocation and afforded an "initial informal interview promptly after [his] return to Service custody to afford the [noncitizen] an opportunity to respond to the reasons for revocation." 8 C.F.R. § 241.13(i)(3). The Notice of Revocation of Release also assures detainees that they will have this opportunity to respond: "You will promptly be afforded an informal interview at which you will be given an opportunity to respond to the reasons for the revocation. You may submit any evidence or information you wish to be reviewed in support of your release." (*See, e.g.*, Doc. 22-12 at 2.)

While the regulations do not give exact specifications for what constitutes an acceptable informal interview, the purpose stated in the regulations is clear: a detainee must have an opportunity to respond to and contest the reason for re-detention. While the government asserts in an entirely conclusory fashion that Khazanov received an informal interview, Khazanov denies that such an interview took place, and the record establishes, at a minimum, that he received no such interview in connection with the Second Notice, which entirely superseded the first and provided *different* reasons for the detention. And it is also abundantly clear that Khazanov was not afforded an opportunity to present *evidence* to be reviewed in support of his release.

As other courts have found, "the intent of the interview is to contest re-detention and avoid erroneous deprivation of a noncitizen's liberty." *Rodriguez Romero*, 2026 WL 321437, at *8 (citing 8 C.F.R. § 241.13(i)(3)). And, as that court also found, this court can do nothing to "retroactively cure the lack of process resulting in [Khazanov's]wrongful detention; indeed, additional process would not so much cure [his] unconstitutional detention as prolong it." *Id.* (record citation omitted).

### E. Habeas Relief Is Warranted

Detention in violation of the government's regulations gives rise to a due process violation. In *United States ex rel. Accardi v. Shaughnessy*, the Supreme Court held that, when the government promulgates regulations "with the force and effect of law," agencies are bound to follow their own "existing valid regulations." 347 U.S. 260, 265, 268 (1954), *superseded on other grounds by statute as recognized in Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103 (2020). Under *Accardi*, a petitioner seeking to prove a due process violation must ordinarily demonstrate prejudice resulting from the violation. *See Am. Farm Lines v. Black Ball Freight Serv.*, 397 U.S. 532, 539 (1970). And generally, the requirements of procedural due process are defined by the United States Constitution, not by an agency's internal regulations or guidelines. *Sandin v. Conner*, 515 U.S. 472, 485 (1995). Consequently, an agency's alleged failure to adhere to its own policies or guidelines does not necessarily give rise to a due process claim. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985).

Here, however, the petitioner was deprived of liberty without notice and in violation of the law and the government's regulations. He continues to be detained indefinitely, with no end in sight and without the government's having identified—before it detained him or to date—a third country willing to accept him. The Supreme Court has recognized that "[a] statute permitting

indefinite detention of an alien would raise a serious constitutional problem." *Zadvydas*, 533 U.S. at 690.

The government does not even respond to the petitioner's claims that his due process rights have been violated. Regardless, it seems clear that, if the government had followed its own regulations, Khazanov would not currently be detained in an ICE facility in Western Tennessee. He has demonstrably been prejudiced by the government's failures. Notably, moreover, multiple courts around the country,

> faced with fact patterns nearly identical to [Khazanov's], have considered the regulations discussed above and found [that t]hese regulations are intended to provide due process in that they are fairly construed to be part of a procedural framework designed to [i]nsure the fair processing of an action affecting an individual, such that when they are not followed, *prejudice is presumed*."

*Rodriguez Romero*, 2026 WL 321437, at *9 (quoting *Santamaria Orellana v. Baker*, No. 25-1788-TDC, 2025 WL 2444087, at *6 (D. Md. Aug. 25, 2025)) (emphasis added by *Rodriguez Romero*)) (collecting cases).

Following *Rodriguez Romero* and dozens of other cases confronted with similar issues, this court finds that Khazanov had an

> overwhelming liberty interest in [his] continued supervised release that was entitled to due process protections. ICE's failure to follow its own mandatory regulations (or otherwise afford [Khazanov] any meaningful notice or opportunity to be heard) in revoking supervised release was *per se* prejudicial.

*Id.* Khazanov is entitled to habeas relief and immediate release from detention.

### F.    The Third Country Removal Policy

The government also does not meaningfully address Khazanov's contention that its Third Country Removal Policy is unconstitutional as applied to him, because it provides inadequate notice and an opportunity to seek fear-based protection, particularly his fear of being sent to a country that will turn around and send him to Russia, where the United States cannot send him

directly. This court finds, as have several other courts, that the Due Process Clause of the Fifth Amendment entitles noncitizens to "reasonable notice of the country to which they will be removed and an opportunity to present claims for various forms of protection from removal." *Kumar v. Wamsley*, 817 F. Supp. 3d 1059 (W.D. Wash. 2025). As another court found:

> According to [the government's] new policy, . . . immigration officers need not give notice or any opportunity to object before removing someone to an unfamiliar and potentially dangerous country, as long as the Government has generally received "assurances" that no persecution or torture will happen there.

> This new policy—which purports to stand in for the protections Congress has mandated—fails to satisfy due process for a raft of reasons, not least of which is that nobody really knows anything about these purported 'assurances.' Whom do they cover? What do they cover? Why has the Government deemed them credible? How can anyone even know for certain that they exist? These are basic questions that the Constitution permits a person to ask before the Government takes away their last and only lifeline.

*D.V.D. v. U.S. Dep't of Homeland Sec.*, --- F.Supp.3d ----, No. CV 25-10676-BEM, 2026 WL 521557, at *2 (D. Mass. Feb. 25, 2026), *appeal filed*, No. 26-1212 (1st Cir. Feb. 28, 2026).

For all the reasons set forth in *D.V.D.* and *Kumar*, the court finds that the government's Third Country Removal Policy is unconstitutional as applied to Khazanov and that he has a credible fear, based on the government's repeated reliance on this policy over the course of the past year, that it will be enforced against him. The government will be directed that it cannot deport Khazanov without providing him adequate notice and an opportunity to seek fear-based protection and, if necessary, to reopen removal proceedings to allow him to present a full claim for relief under 8 U.S.C. § 1231(b)(3) and the FARRA.

## IV.   CONCLUSION

The petitioner is entitled to relief under § 2241. His habeas petition will be granted in part,[7] and the Amended TRO will be dissolved as moot. An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge

---

[7] Finding that the petitioner is entitled to release from custody on the grounds addressed herein, the court has not reached all of the claims for relief set forth in the Amended Petition.